UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| - - - - - - - - - - - - - - X | 99-CR-369 (RJD) |
| UNITED STATES OF AMERICA, : | |
| - against - : | |
| : | United States Courthouse |
| MICHAEL ORLINO, : | Brooklyn, New York |
| Defendant. : | |
| - - - - - - - - - - - - - - X | April 20, 1999 |

TRANSCRIPT OF CRIMINAL CAUSE FOR GUILTY PLEA
BEFORE THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiff: ZACHARY W. CARTER
United States Attorney

BY: JOHN MOTHNER, ESQ.
Assistant United States Attorney
225 Cadman Plaza East
Brooklyn, New York 11201

For the Defendant: MARK FONTE, ESQ.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ JAN 24 2006 ★
BROOKLYN OFFICE

Court Transcriber: ROSALIE LOMBARDI
2348 83rd Street
Brooklyn, New York 11214
(718) 266-1590

Proceedings recorded by electronic sound recording, transcript produced by CAT.

THE CLERK: United States of America versus Michael Orlino.

Would Counsel please note your appearances for the record.

MR. MOTHNER: Sure. For the government, John Mothner.

MR. FONTE: Good morning, Judge. On behalf of Michael Orlino, my name is Mark Fonte, F-O-N-T-E, with law offices at 60 Bay Street, Staten Island, New York.

THE COURT: All right. Good morning. Why don't you gentleman come on up. All right. Mr. Orlino --

THE DEFENDANT: Yes.

THE COURT: -- I take it that you understand English?

THE DEFENDANT: That's correct.

THE COURT: If at any point during these proceedings I say something that you don't understand, please tell me; okay.

THE DEFENDANT: Okay.

THE COURT: The first issue I want to deal with is your consent to have me hear your plea.

You understand that this is Judge Dearie's case, and he is the United States District Court

Judge who will sentence you and make the ultimate decision as to whether or not to accept your plea of guilty. If you wish, you have the absolute right to have Judge Dearie hear your plea, and if you choose to do that, there will be no prejudice to you.

On the other hand, if you wish, I will hear your plea this morning, and a transcript of these proceedings will be made from that tape recording device over there, and that transcript will be provided to Judge Dearie to review at the time of your sentence and when he makes his ultimate decision whether or not to accept your plea of guilty.

Do you wish to give up your right to have Judge Dearie hear your plea and proceed instead before me this morning?

THE DEFENDANT: Yes.

THE COURT: Do you make this decision voluntarily and of your own free will?

THE DEFENDANT: Yes.

THE COURT: Has anyone made any threats or promises to induce you to have me hear your plea?

THE DEFENDANT: No.

THE COURT: This is the consent form, and I take it that that's your signature there, sir?

THE DEFENDANT: That is correct.

THE COURT: I will note for the record it's been signed by Mr. Fonte and by the Assistant US Attorney, and I'm endorsing it as well.

All right. Now, Mr. Orlino, before I can hear your plea, there are a number of questions that I must ask you to ensure that it is a valid plea. Again, if you don't understand any of my questions, just tell me, and I will rephrase them; okay.

THE DEFENDANT: Okay.

THE COURT: Frankie, will you please swear in the defendant?

THE CLERK: Of course, your Honor.

Would you please raise your right hand.

You do solemnly swear that the statements you are about to make before the Court in this pleading shall be the truth, the whole truth and nothing but the truth, so help you God?

THE DEFENDANT: I do.

THE COURT: Now, you understand, Mr. Orlino, that having been sworn your answers to my questions will be subject to the penalties of perjury or making a false statement, if you don't answer them truthfully.

Do you understand that?

THE DEFENDANT: I do.

THE COURT: What is your full name?
THE DEFENDANT: Michael Anthony Orlino.
THE COURT: And how old are you?
THE DEFENDANT: Thirty-three.
THE COURT: What education have you had?
THE DEFENDANT: High school.
THE COURT: Graduated from high school?
THE DEFENDANT: Yes.
THE COURT: Have you had any difficulty communicating with Mr. Fonte, your attorney?
THE DEFENDANT: Not at all.
THE COURT: Counsel, have you had any problems communicating with your client?
MR. FONTE: No, your Honor.
THE COURT: Mr. Orlino, are you presently or have you recently been under the care of a physician or a psychiatrist?
THE DEFENDANT: No.
THE COURT: In the last 24 hours, have you taken any narcotic drugs?
THE DEFENDANT: No.
THE COURT: Any medicine or pills of any kind?
THE DEFENDANT: No.
THE COURT: In the last 24 hours, have you

had an alcohol to drink?

THE DEFENDANT: No, I have not.

THE COURT: Have you ever been hospitalized or treated for narcotics addiction?

THE DEFENDANT: No.

THE COURT: Have you ever been treated for any mental or emotional problems?

THE DEFENDANT: No.

THE COURT: As you stand here before today, is your mind clear?

THE DEFENDANT: Yes.

THE COURT: Do you understand what it is we're doing here today?

THE DEFENDANT: Yes, I do.

THE COURT: This is the information that the government has furnished to me. Have you received a copy of the information?

THE DEFENDANT: Yes, I have.

THE COURT: Now, you understand that this information contains four charges, each of which are felony counts.

Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: I'm going to try and summarize the information that's before me today.

Count one charges you with a conspiracy relating to securities fraud committed at Hanover Sterling and Company, a brokerage firm which, I gather, was located in Manhattan and in Boca Raton, Florida where you were employed. The charge reads as follows:

In or about and between January 1993 and February 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, you together with others employed by and associated with Hanover did knowingly and wilfully conspire to use and employ manipulative and deceptive devices and contrivances and directly and indirectly employed devices, schemes and artifices to defraud, make untrue statements of material fact, and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon the investing public in connection with purchases and sales of securities, by use of instruments of interstate communications in interstate commerce and the mail in violation of the United States Code and the rules and regulations of

the Securities Exchange Commission.

It was part of the conspiracy that while employed at Hanover, you and other manipulated the share prices of the Hanover house stock.

And in furtherance of the conspiracy and to effect the objects thereof, including artificially inflating the prices of the Hanover house stock, within the Eastern District of New York and elsewhere you together with others, did commit and cause to be committed the following overt acts:

(a) On numerous occasions during the timer period charged, you received kickbacks based on the number of shares you sold of Hanover house stocks.

(b) On numerous occasions during the time period charged, you failed to inform customers that you were receiving kickbacks based on the number of shares you sold of Hanover house stocks.

(c) On numerous occasions during the time period charged, you actively discouraged customers from selling Hanover house stock and agreed to submit a customer's order to sell such stocks generally only if you could cross the sale with a matched buy order for Hanover house stocks; and

(d) On numerous occasions during the

time period charged, you failed to advise your customers purchasing Hanover house stocks that the sales of the stock would be actively discouraged and would generally be made only if the corresponding buy from another Hanover customer could be made, all in violation of Title 18 United States Code Section 371.

Now, count two charges you with a few more securities fraud conspiracy at Norfolk Securities corporation, which I understand is a Manhattan brokerage firm where you were also employed. Count two charges you with in or about and between August 1995 and September 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, you together with others employed by and associated with Norfolk did knowingly and wilfully conspire to use and employ manipulative and deceptive devices and contrivances and directly and indirectly employed devices, schemes and artifices to defraud, make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon the investing public in connection

with purchases and sales of securities by use of instruments of interstate communication, in interstate commerce and the mail in violation of the United States Code and the rules and regulations of the SEC.

It was part of the conspiracy that while employed at Norfolk, you and others manipulated the share prices of the Norfolk house stocks.

In furtherance of the conspiracy and to affect its objects including artificially inflating the prices of the Norfolk house stocks, within the Eastern District of New York and elsewhere, you together with others did commit and cause to be committed the following overt acts:

(a) On numerous occasions during the time period charged, you received kickbacks based on the number of shares you sold of Norfolk House stocks.

(b) On numerous occasions during the time period charged, you failed to inform customers that you were receiving kickbacks based on the number of shares you sold of Norfolk house stocks.

(c) On numerous occasions during the time period charged, you actively discouraged customers from selling Norfolk house stock and agreed

to submit a customer's order to sell such stocks generally only if you could cross the sale with a matched buy order for Norfolk house stocks; and

(d) On numerous occasions during the time period charged, you failed to advise your customers purchasing Norfolk house stocks that the sales of the stock would be actively discouraged and would generally be made only if the corresponding buy from another Norfolk customer could be made, all in violation of Title 18 United States Code Section 371.

The third count in the information charges you with in or about and between June 1996 and May 1998, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, you together with others did knowingly and intentionally engage and attempt to engage in monetary transactions affecting interstate commerce and criminally derived property that was of a value greater than $10,000, and was derived from specified unlawful activity, specifically, securities, mail and wire fraud.

Count four charges you with on or about March 24, 1999, within the Eastern District of New York, you did knowingly and wilfully make a materially false, fictitious and fraudulent statement

and representation in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the FBI, in that you stated and represented that $20,000 you had received from Robert Titogio (ph) in August 1996 was a loan, when, in fact, as you then and now well know and believe, the $20,000 was a kickback for selling securities to your customers at Norfolk.

Now, do you understand each of these charges?

THE DEFENDANT: Yes, I do.

THE COURT: Now, you understand that because each of these is a felony charge, you have a constitutional right to be charged by an indictment brought by a grand jury. You can waive that right and consent to being charged by information brought by the United States Attorney.

Now, unless you agree to waive indictment, these charges may not be brought against you, unless the government first presents evidence to the grand jury and the grand jury determines that there is probable cause that a crime has been committed, and that you, in fact, have committed the crime. Now, a grand jury is composed of at least 16 and not more than 23 people who are asked to consider whether or

not there's probable cause to believe that you committed the crime that the government seeks to charge you with. Now, a grand jury may or it may not decide to indictment you, but unless you waive your right to be indicted by a grand jury, the government cannot proceed against you on this information. If you do waive indictment by the grand jury, the government can proceed against you on the charges in this information just as if a grand jury had considered the evidence and had determined that there was probable cause.

Now, have you discussed the matter of waiving your right to be indicted by a grand jury with your attorney?

THE DEFENDANT: Yes.

THE COURT: And do you understand your right to be indicted by a grand jury?

THE DEFENDANT: Yes.

THE COURT: Has anyone made any threats or promises to get you to agree to waive indictment?

THE DEFENDANT: No, ma'am.

THE COURT: Do you wish at this time to waive your right to be indicted by a grand jury?

THE DEFENDANT: Yes.

THE COURT: Counsel, do you know of any

reason why the defendant should not waive indictment?

MR. FONTE: I do not.

THE COURT: All right. Now, Mr. -- this is the waiver of indictment form. Is that your signature there, sir?

THE DEFENDANT: Yes.

THE COURT: And I'll note for the record that it's also been signed by Mr. Fonte.

I find that the defendant has been advised of the nature of the charges, the proposed information, and of his rights, and that he hereby waives in open court on this date his right to be indicted by a grand jury and consents to proceeding on the basis of the information, and I am endorsing the waiver of indictment at this time. Here's a copy for each of you and one is for me.

All right. Now, I take it that Mr. Orlino intends to enter a plea of guilty at this time, Counsel?

MR. FONTE: That is correct.

THE COURT: To all four counts?

MR. FONTE: To all the four counts contained in the information.

THE COURT: All right. Have you discussed the matter of pleading guilty with your client?

MR. FONTE: I have.

THE COURT: And does he understand the rights he will be waiving by pleading guilty?

MR. FONTE: Yes, I have discussed all his constitutional rights with him at length. It is my belief he fully understands them.

THE COURT: Okay. In your view, is he capable of understanding the nature of these proceedings?

MR. FONTE: Yes, he is.

THE COURT: Do you have any doubt whatsoever as to his competence to plead at this time?

MR. FONTE: No, Judge.

THE COURT: Have you advised him of the maximum sentence and the fine that can be imposed as a result of his plea?

MR. FONTE: I have.

THE COURT: And have you discussed with him the operation of the sentencing guidelines?

MR. FONTE: I have.

THE COURT: All right. Mr. Orlino, have you had sufficient time to discuss your case with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: And are you satisfied to have him represent you?

THE DEFENDANT: Yes.

THE COURT: Now, we've reviewed the information a moment ago. Have you consulted with your attorney about the charges contained in the information?

THE DEFENDANT: Yes.

THE COURT: I want to make sure that you understand the rights that you will be giving up by pleading guilty; okay.

If you were to plead not guilty to these charges under the Constitution and Laws of the United States, you would be entitled to a speedy and public trial by jury with the assistance of counsel on the charges contained in this information.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: At that trial you would be presumed innocent, and the government would have to overcome that presumption and prove you guilty by competent evidence and beyond a reasonable doubt. You would not have to prove that you were innocent. If the government were to fail, the jury would have the duty to find you not guilty.

Do you understand?

THE DEFENDANT: Yes.

THE COURT: In the course of the trial, the witnesses for the government would have to come to court, and they would have to testify in your presence, and your attorney would have the right to cross-examine those witnesses for the government, to object to any evidence offered by the government and to offer evidence on your behalf.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: At that trial while you would have the right to testify, if you chose to do so, you could not be forced to testify. Under the Constitution of the United States, a defendant in a criminal case cannot be forced to take the witness stand and say anything that can be used to show that he is guilty of the crime with which he's been charged. If you were to decide not to testify, the Court would instruct the jury that they could not hold that decision against you.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you plead guilty on the other hand, I'm going to have to ask you certain

questions about what it is that you did in order to satisfy myself that you are, in fact, guilty of the crime to which you seek to plead guilty. And you're going to have to answer my questions and acknowledge your guilt. Thus, you will be giving up that right that I've just described; namely, the right not to say anything that can be used to show that you're guilty of the crime with which you've been charged.

Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: If you plead guilty and I recommend to Judge Dearie that he accept your plea, you will be giving up your constitutional right to a trial and all of the other rights that I've just described. There will be no further trial of any kind and no right to an appeal. Judge Dearie will simply enter a judgment of guilty based upon your guilty plea.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Are you willing to give up your right to a trial and the other rights that I've just described?

THE DEFENDANT: Yes.

THE COURT: Now, I understand there is

written plea agreement in this case. I'm going to mark it as Court Exhibit 1 for purposes of today's proceedings.

Mr. Orlino, have you seen this agreement before?

THE DEFENDANT: Yes, I have.

THE COURT: And have you had an opportunity to read it?

THE DEFENDANT: Yes.

THE COURT: And do you understand what it provides?

THE DEFENDANT: Yes, I do.

THE COURT: And is that your signature on the last page? I guess it's the second to the last page.

THE DEFENDANT: Yes.

MR. FONTE: Page nine, for the record.

THE COURT: Thank you. Does this agreement fully and accurately reflect your understanding of the agreement that you have with the government?

THE DEFENDANT: Yes, it does.

THE COURT: Other than the promises set forth in this agreement, has anyone made any other promise that has caused you plead guilty?

THE DEFENDANT: I'm sorry. Could you repeat that?

THE COURT: I said, other than the promises set forth in the agreement, has anyone made any other promise that has caused you to plead guilty?

THE DEFENDANT: No.

THE COURT: Has anyone made any promise to you as to what your sentence will be?

THE DEFENDANT: No.

THE COURT: I want to briefly discuss with you the sentencing scheme that applies here. With respect to counts one and two, the statute you are accused of violating carries a maximum term of imprisonment for each count of five years, minimum term of imprisonment of zero years.

Now, there are in effect what are called sentencing guidelines, and those guidelines determine where within the zero to five year range Judge Dearie can sentence you. Those guidelines determine how high a sentence he can impose and how low a sentence he can impose. And there may be other factors that come into play at the time of your sentencing that will allow the Court to depart either upwardly or downwardly, depending on the circumstances.

Do you follow me so far?

THE DEFENDANT: Yes, I do.

THE COURT: The important thing that you need to realize with respect to all of these counts is that, until the time of sentencing when Judge Dearie gets what's called a presentence report, which will be prepared by the Probation Department following your plea here, and he has an opportunity to hear from you, and to hear from your attorney, and to hear from the government, until that time no one can know exactly what your sentence will be; not the attorneys, not me, not even Judge Dearie until that moment.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: With respect to count three, the money laundering count, you face a maximum term of imprisonment of ten years and a minimum term of imprisonment of zero years. And on count four, you face a maximum term of imprisonment of five years and a minimum term of imprisonment of zero years.

Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Now, your sentence may be imposed consecutively on each count. In other words,

one to run right after the other.

Do you understand that as well?

THE DEFENDANT: Yes.

THE COURT: Has the government made an estimate of what the guideline range would be at this point, given what you know?

MR. MOTHNER: Your Honor, the extent of the fraud at the securities firms has not been specifically calculated. However, it's the government's belief that it is in excess of the highest amount in the fraud table and the guidelines. And for today's purposes, the government assumes that the guideline range could well be up to the 25 year maximum of the statutory sentences set forth for the counts to which the defendant is pleading guilty.

THE COURT: Okay. And that's running them all consecutively?

MR. MOTHNER: All consecutively; that's correct, your Honor.

THE COURT: Do you understand that that's what the government's estimate is?

THE DEFENDANT: Yes.

THE COURT: Okay. I don't know whether counsel has any quarrel with -- there were no adjustments or --

MR. MOTHNER: Well, the fact is that the -- given the extent of the fraud, it is very possible that the guideline range could be in the 25 year range.

THE COURT: Okay.

MR. FONTE: Your Honor, I would concede the possibility, although I certainly reserve my right to argue the guidelines at the appropriate time.

THE COURT: Okay.

MR. MOTHNER: Just for the record, it's important that the government -- that the defendant assume for today's purposes that there is a possibility that the guideline range could be in the 25 year range.

THE COURT: Do you understand that? As a result of your plea here today, you could end up getting a jail term of up to 25 years.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You also understand that regardless of what term of imprisonment you may be sentenced to serve, you face supervised release terms under each of these counts.

Do you understand what supervised release

is?

THE DEFENDANT: Yes.

THE COURT: In other words, once you're released from jail, there will be certain restrictions placed on your liberty. For example, you may have to report to a probation officer on a periodic basis, and there may be other restrictions as well, such as not being allowed to work in the securities industry again. The important thing that you need to understand is that as a result of your plea to count one, you face a maximum term of supervised release of three years. And if you violate any of the conditions of your supervised release, you can be sentenced up to two years imprisonment without credit for any time that you previously served in prison and without credit for or any time that you successfully served on supervised release prior to the date of the violation.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And a similar maximum term of supervised release applies to count two. In other words, its three years. And if you violate the conditions, you can be sentenced up to two years in prison; right.

With respect to count three, you face a maximum term of supervised release of five years. And if you violate any of the conditions of your release under that count, you could be sentenced up to three years imprisonment without credit for time previously served.

Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: And finally, on count four, the supervised release term is three years with the time that you could be sentenced for violations up to two years.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Similarly, under each count, you face fines. With respect to count one and count two -- I guess with respect to counts one, two and four, the maximum fine that you face is $250,000. With respect to count three, the maximum fine is $250,000 or twice the value of the property involved in the financial transactions, whichever is greater. And I gather the government doesn't know at this point which one is going to be greater, but it sounds like it might be the latter.

MR. MOTHNER: It could be, your Honor.

THE COURT: You may also have to pay restitution under counts one, two and three. And under each of the counts -- no, that's not true -- under the first count, count one, you must pay a $50 special assessment. Under counts two, three and four, you must pay a $100 special assessment each, for a total of $350. That is something that you will have to pay.

Do you understand that as well?

THE DEFENDANT: Yes, I do.

THE COURT: Anything else, Mr. Mothner, that I should advise him of in the agreement?

MR. MOTHNER: No, your Honor. There's no --

THE COURT: Special --

MR. MOTHNER: -- special provisions in the agreement.

THE COURT: Mr. Orlino, do you have any questions you'd like to ask me about your rights or the charge or the plea agreement or anything else before we proceed?

THE DEFENDANT: No, I don't.

THE COURT: Are you ready to plead at this time?

THE DEFENDANT: Yes, I am.

THE COURT: Counsel, do you know of any reason why the defendant should not plead guilty?

MR. FONTE: I do not.

THE COURT: Are you aware of any legal defense to the charges?

MR. FONTE: No, Judge.

THE COURT: Michael Orlino, what is your plea to count one of Information 99-CR-369, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: What is your plea to count two of Information 99-CR-369, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: What is your plea to count three of Information 99-CR-369, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: What is your plea to count four of Information 99-CR-369, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Are you making these pleas of guilty voluntarily and of your own free will?

THE DEFENDANT: Yes, I am.

THE COURT: Has anyone threatened or forced you to plead guilty?

THE DEFENDANT: No, they have not.

THE COURT: Has anyone made any promise to you as to what sentence you will receive?

THE DEFENDANT: No.

THE COURT: I want to start with count one; okay.

THE DEFENDANT: Okay.

THE COURT: I summarized it for you a few minutes ago, and I want you to tell me in your own words what it is that you did between January 1993 and February 1995 in connection with the Hanover stocks?

THE DEFENDANT: While I was employed at Hanover Sterling --

(Pause in proceedings.)

(Off the record.)

THE COURT: All right. We're back on the record again. Why don't you start at the beginning and tell me again what happened.

THE DEFENDANT: Okay. While I was employed at Hanover Sterling, I acted as a stockbroker purchasing these house stocks for Hanover Sterling for my clients.

THE COURT: And what house stocks? Can you just list some of the house stocks that were involved?

THE DEFENDANT: All Pro Products, American Toys, Best Resources, Eagle Vision, Environmetrics, Mr. J. Fashions, Panix (ph) Pharmaceutical Corp., McCloud National Retailer and Playco Toys.

THE COURT: Okay. And tell me what you did with these stocks.

THE DEFENDANT: Well, I would purchase these stocks for my clients at times giving them fictitious information --

THE COURT: About the stocks?

THE DEFENDANT: -- to entice them about the different securities; correct. Enticing them to buy -- purchase the shares in these companies, not disclose -- got an exorbitant amount of commissions above the industry norm to purchase these stocks, and I didn't disclose that to my clients.

THE COURT: You didn't disclose to them that you were receiving higher commissions than normal?

THE DEFENDANT: Than the industry standard; correct.

THE COURT: Okay.

THE DEFENDANT: And I didn't disclose to them either that in order to exit or to sell the stock, I would have to cross that stock, sell their

stock and match it up with a buy order in order to keep these individual house stocks artificially inflated.

THE COURT: Okay. So, in other words, if I understand what crossing means, you have a seller of stock. You have to have a purchaser of that same amount or the same shares of that same stock --

THE DEFENDANT: A minimum.

THE COURT: -- before you would be willing to sell it?

THE DEFENDANT: Correct.

THE COURT: And you did not tell the purchasers of this stock that you were doing this?

THE DEFENDANT: Correct.

THE COURT: Okay. And did you receive kickbacks based on the number of shares that you sold?

THE DEFENDANT: Well, the kickbacks is the enormous amount of commissions that I got.

THE COURT: That's the commissions; okay. And did you actively discourage your customers from selling their shares at times?

THE DEFENDANT: Most of the time; correct.

THE COURT: Okay.

THE DEFENDANT: Unless I wanted them to

sell; yeah.

THE COURT: Okay. Anything else on count one?

MR. MOTHNER: No, your Honor. The government would prove that these securities traded over the NASDAQ System.

THE COURT: Okay.

MR. MOTHNER: And that NASDAQ operates in a way that trades are reported in every district in the country, including the Eastern District of New York.

THE COURT: Okay. Where exactly were you located, Mr. Orlino, when you were selling these stocks?

THE DEFENDANT: You want the address of the building?

THE COURT: Yes.

THE DEFENDANT: 88 Pine Street in Manhattan.

THE COURT: In Manhattan; okay.

THE DEFENDANT: New York, New York.

THE COURT: Okay. And this was between January 1993 and February 1995?

THE DEFENDANT: That's correct.

THE COURT: That was when you --

THE DEFENDANT: Give or take a couple of months.

THE COURT: Okay. Mr. Mothner, the basis for venue is the fact that the shares sold --

MR. MOTHNER: That's correct. The basis for venue is that it was conducted over the NASDAQ System, and that those trades are reported everywhere, including in the Eastern District of New York.

THE COURT: Okay. And I take it that the government is also prepared to prove that there were mails and --

MR. MOTHNER: That's correct.

THE COURT: -- were used.

MR. MOTHNER: To the extent that trades were executed and confirmations were sent during the period of the house -- is that correct?

THE DEFENDANT: That is correct.

THE COURT: And did you also speak over the phone regarding these?

THE DEFENDANT: To my clients?

THE COURT: To your clients.

THE DEFENDANT: Yes, I did.

THE COURT: All right. Let's look at count two. This is the conspiracy with respect to

the Norfolk stock. Can you tell me what you did in or about and between August of 1995 and September of 1996 in connection with the Norfolk stock?

THE DEFENDANT: The same thing as basically as Hanover Sterling. Purchasing these certain stocks mentioned, Entaris Resources (ph), First Colonial Ventures, JJFN Holdings and Cloak (ph) Corp. International, getting an exorbitant amount of commissions for these -- for the purchasing -- to entice me to purchase these stocks for my clients without disclosing to my clients that I was getting paid these large commissions. And in order for my clients to sell or exit these stocks, I would have to also cross them, like I did at Hanover's, with a corresponding buy.

THE COURT: Okay. And you did this while you were employed at Norfolk?

THE DEFENDANT: That is correct. And I also gave the misleading information or some fictitious information to entice my clients to purchase these stocks to make them look --

THE COURT: To inflate the value or whatever of the stock?

THE DEFENDANT: Right, umm-humm; that's correct.

THE COURT: Okay. Where was Norfolk located?

THE DEFENDANT: I believe 30 Broad Street --

THE COURT: Also in Manhattan?

THE DEFENDANT: -- if my memory serves me. Correct. 30 Broad Street, downtown Manhattan, also.

THE COURT: Okay. And with respect to both count one and count two, I take it that you were operating with others? You were agreeing with others to do this? Somebody was paying you the excess commissions?

THE DEFENDANT: That's correct.

THE COURT: Your boss or --

THE DEFENDANT: The owners of the firm.

THE COURT: Of both Norfolk and --

THE DEFENDANT: Hanover Sterling.

THE COURT: Mr. Mothner, any --

MR. MOTHNER: No, your Honor. I think that's sufficient with respect to counts one and two.

THE COURT: And I take it that, again, the mails were used in connection with confirmation slips sent out on --

THE DEFENDANT: That's correct.

THE COURT: -- from Norfolk?

MR. MOTHNER: That's correct. And also the wires were used consummate these transactions, and the basis for venue is the same, your Honor.

THE COURT: All right. And the government would prove, I guess, as well that there was interstate commerce?

MR. MOTHNER: That is correct.

THE COURT: Let's go to count three. This is the charge of engaging in monetary transactions between June 1996 and May 1998. Can you tell me what you did in connection with this charge?

THE DEFENDANT: This is the charge where I got compensated more than $10,000 for doing the job of getting my clients in these stocks.

THE COURT: This was for what firm? Was this Norfolk?

THE DEFENDANT: For both firms, your Honor. And also, I got compensated on one -- and a time for $20,000 in a check that I deposited into my checking account, and used that, you know, for personal things --

THE COURT: Okay, but --

THE DEFENDANT: -- which was compensation for purchasing and engaging in these unlawful things.

THE COURT: It was compensation for your

selling these stocks to people with false representations?

THE DEFENDANT: Yes, that's correct.

THE COURT: This was some portion of the excess commissions that you were receiving?

THE DEFENDANT: Right, above and beyond the norm.

THE COURT: Okay. And that was more than $10,000 in total is what you're saying?

THE DEFENDANT: Yeah. The majority of the time it was more than $10,000.

THE COURT: Okay.

MR. MOTHNER: And with respect to the $20,000 payment, where did you receive that check?

THE DEFENDANT: At Norfolk Securities.

MR. MOTHNER: And where did you deposit it?

THE DEFENDANT: A bank, my bank.

MR. MOTHNER: And where is your bank account?

THE DEFENDANT: Staten Island, New York.

THE COURT: And that's the basis for venue here?

MR. MOTHNER: That's the basis for venue here?

THE COURT: Okay. That check was received somewhere between June of 1996 and May of 1998?

THE DEFENDANT: When I -- during the time I was employed at Norfolk Securities, whichever that was.

MR. MOTHNER: I think the government would prove that the check was received in August of 1996, and there were subsequent payments that the defendant alluded to that occurred after that time as well, which the government would prove were also deposited in the defendant's bank account in Staten Island.

THE COURT: Is that basically accurate?

THE DEFENDANT: Yes. Yes, it is, your Honor.

THE COURT: All right.

THE COURT: And count four is the false statement charge. Can you tell me what happened on or about March 24, 1999 with respect to the FBI?

THE DEFENDANT: Yeah. When I was -- I went in for the first time. I was never arrested before. I sat down and I was speaking with the gentleman, and I stated that a $20,000 payment was a loan when I knew it was a payment, compensation for buying new stocks.

THE COURT: Was this the same $20,000 that

you were just referring to a moment ago?

THE DEFENDANT: Yes, I believe it was.

THE COURT: And this was $20,000 that you received from Robert Titogio?

THE DEFENDANT: Titagio (ph).

THE COURT: Titagio, sorry. And the gentleman you were speaking to, I take it, was an FBI agent?

THE DEFENDANT: Yeah, I knew he was a federal agent.

THE COURT: All right.

MR. MOTHNER: And that took place, your Honor, in the Eastern District of New York, that conversation.

THE COURT: The interview?

MR. MOTHNER: The interview; that's correct.

THE COURT: And you knew at the time that the statement you were making to this agent was false?

THE DEFENDANT: That's correct.

THE COURT: Anything else, Mr. Mothner?

MR. MOTHNER: No, I think that's sufficient, your Honor.

THE COURT: All right. Based on the

information given to me, I find that the defendant is acting voluntarily, fully understands his rights and the consequences of his plea, and that there is a factual basis for the plea.

I will, therefore, recommend to Judge Dearie that he accept your plea of guilty to the four counts in the information.

Now, I think I mentioned before that the Probation Department is going to prepare a presentence report. They are going to want to meet with you, obviously, with counsel's advice. And once that report is prepared, I take it, then a date will be set for sentencing; okay.

THE DEFENDANT: Okay.

MR. MOTHNER: Your Honor, the government and the defendant would request that the minutes of this proceeding be sealed because of the nature of the proceeding and the nature of the agreement that the defendant has entered into with leave for the government to obtain a transcript of this for purposes of 3500 material, to the extent when that is necessary to be produced.

THE COURT: Okay. And a copy, obviously, will also be given to Judge Dearie to review.

MR. MOTHNER: Yes, your Honor.

THE COURT: Okay. It will be sealed.

THE COURT: I take it that the defendant is out on bail?

MR. MOTHNER: That's correct, your Honor. He has been -- he has appeared before a magistrate and a bond has been set, and there's no motion by government to change the bail conditions.

THE COURT: To modify the bail at this time. Okay, fine. And I take it, also, there is no property issues involved in this case?

MR. MOTHNER: No, your Honor. There was no property seized from the defendant.

THE COURT: All right. Thank you.

THE DEFENDANT: Thank you very much, your Honor.

(Matter concluded.)

oOo

C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound recording of the proceedings reduced to typewriting by me in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of May, 1999.

[signature]